ROBERT L. WINEBRENNER v. EDWARD C. FORNEY.

(Filed July 16, 1902.)

PUBLIC LANDS—Who not Disqualified to enter. One who was within the Ponca Indian reservation before the hour of 12 o'clock noon. (central standard time,)of September 16, 1893, and made the race from said reservation into that part of the Cherokee outlet which was opened to settlement on that day, is not by reason thereof, disqualified from settling upon and filing a homestead entry upon a quarter section of land within the country then declared open to settlement.

(Syllabus by the court.)

*Appeal from the District Court of Kay County; before Bayard T. Hainer, Trial Judge.*

*S. H. Harris,* for appellant.

*Dale & Bierer,* for appellee.

Opinion of the court by

BURWELL, J.: This case involves the question as to wherther one who made the race into the Cherokee outlet, on

September 16, 1893, from the west line of the Ponca Indian reservation is a "sooner," and therefore disqualified to make homestead entry of any of the lands thrown open to settlement by the president's proclamation dated August 19, 1893. Edward C. Forney made the run into the Cherokee outlet on the day of the opening and made homestead entry on the land in controversy, which is the southwest quarter of section nineteen, township twenty-six north, of range one east of the Indian meridian, in Kay county.

Robert L. Winebrenner filed a contest against Forney on the grounds of prior settlement and "soonerism." The contest was tried in the local land office, then appealed to the commissioner of the general land office and then to the secretary of the interior, who found in favor of Forney on both questions. Patent was issued to Forney and Winebrenner began this suit to declare a resulting trust. In the district court a demurrer to the petition was sustained, and plaintiff refusing to plead further, judgment for defendant for costs and dismissal of the action was rendered, and the plaintiff appealed to this court. We are inclined to the opinion that this case might be disposed of on technical grounds but as counsel on both sides have seen fit to waive every question except the one of disqualification of Forney, we will, because of the many other cases in the lower courts involving the same question, decide that point so that these parties, as well as other persons interested in similar cases, may know their respective rights without further delay.

By section 14 of the act of congress of March 2, 1889 it is provided:

"The president is hereby authorized to appoint three commissioners, not more than two of whom shall be members

of the same political party, to negotiate with the Cherokee Indians and with all other Indians owning or claiming lands lying west of the ninety-sixth degree of longitude in the Indian Territory for the cession to the United States of all their title, claim, or interest of every kind or character in and to said lands, and any and all agreements resulting from such negotiation shall be reported to the president and by him to congress at its next session and to the council or councils of the nation or nations, tribe or tribes, agreeing to the same for ratification, and for this purpose the sum of twenty-five thousand dollars, or as much thereof as may be necessary, is hereby appropriated, to be immediately available: Provided, That said commission is further authorized to submit to the Cherokee nation the proposition that said nation shall cede to the United States in the manner and with the effect aforesaid, all the rights of said nation in said lands upon the same terms as to payment as is provided in the agreement made with the Creek Indians of date January nineteenth, eighteen hundred and eighty-nine, and ratified by the present congress; and if said Cherokee nation shall accept, and by act of its legislative authority duly pass and ratify the same, the said lands shall thereupon become a part of the public domain for the purpose of such disposition as is herein provided, and the president is authorized as soon thereafter as he may deem advisable, by proclamation, to open said lands to settlement in the same manner and to the same effect, as in this act provided concerning the lands acquired from said Creek Indians, but until said lands are opened for settlement by proclamation of the president, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall be permited to enter any of said lands or acquire any right thereto."

Counsel for appellant contends that by the terms of this act all persons were prohibited from entering upon and occupying any of the lands west of the ninety-sixth degree of longitude, no matter whether it was lands claimed by the

Cherokee or other Indians; that the Ponca reservation is west of the ninety-sixth degree of longitude and therefore no one could go upon it until thrown open to settlement, which has not yet been done. It is true that the section just quoted provides that no person shall be permitted to enter upon and occupy any of the lands referred to and that no person violating the provisions thereof shall be permitted to enter any of the lands described or acquire any right thereto, and it is also true that this section includes the Ponca Indian reservation, but this act must be considered in the light of subsequent acts of congress and the president's proclamation opening the Cherokee lands to settlement; and in order that a more complete understanding of the facts may be had we here give a map of these different reservations and lands.

We will now notice the provisions of section ten of the act of congress of March 3, 1893:

"The president of the United States is hereby authorized, at any time within six months after the approval of this act

and the acceptance of the same by the Cherokee nation as herein provided, by proclamation, to open to settlement any or all of the lands not alloted or reserved, in the manner provided in section thirteen of the act of congress approved March the second, eighteen hundred and eighty-nine, entitled 'An Act making appropriations for the current and contingent expenses of the Indian department and for fulfilling treaty stipulations with various Indian tribes, for the year ending June the thirteenth, eighteen hundred and ninety, and for other purposes, etc.' "

Section thirteen of the act of March second, 1889, refers to what section shall be reserved for school land, length of residence, amount to be paid, qualifications of entryman, etc., and then section ten of the act of March 3, 1893, concludes:

"No person shall be permitted to occupy or enter upon any of the lands herein referred to, except in the manner prescribed by proclamation of the president opening the same to settlement; and any person otherwise occupying or entering upon any of said lands shall forfeit all right to acquire any of said lands. The secretary of the interior, shall, under the direction of the president prescribe rules and regulations not inconsistent with this act, for the occupation and settlement of said lands, to be incorporated in the proclamation of the president, which shall be issued at least twenty days before the time fixed for the opening of said lands."

Then finally in the president's proclamation we find this language:

"Said lands so to be opened as herein proclaimed, shall be entered upon and occupied only in the manner and under the provisions following, to-wit:

"A strip of land one hundred feet in width, around and immediately within the outer boundaries of the entire tract of the country, to be opened to settlement under this proclamation, is hereby temporarily set apart for the following purposes and uses, viz.:

"Said strip, the inner boundary of which shall be one hundred feet from the exterior boundary of the country known as the Cherokee outlet, shall be opened to occupancy in advance of the day and hour named for the opening of said country, by persons expecting and intending to make settlement pursuant to this proclamation. Such occupancy shall not be regarded as trespass or in violation of this proclamation, or of the law under which it is made; nor shall any settlement rights be gained thereby."

Appellant insists that it was intended by this language to set apart a strip of land one hundred feet wide around all of the Indian country west of the ninety-sixth degree of longitude. This would place the line from which the run could be made from the east all the way from twelve to fifty miles east of the land actually open to settlement. In other words, persons desiring to make the run from the east would have run across a strip of land from twelve to fifty miles wide before they would reach the edge of the land which was to be opened to settlement and entry. We cannot agree with this view of the law, because it will be presumed that the president did that which he had a lawful right to do, and it is questionable if he had the right to open up, even temporarily for the use of those who wished to make the run, a strip of land one hundred feet wide off of the east side of the Osage Indian reservation and deprive the Indians and their lessee of the occupancy thereof even for the twenty-eight days intervening between the proclamation and the date of opening, while he did have the undoubted right to open up a strip one hundred feet wide immediately within the outer lines of the land actually opened to settlement. And this is what we think he did. These are the lands which he had in mind when he wrote the proclamation. He was not then trying to keep people out of the lands which the government had not even treated for,

but out of the lands which he was proclaiming should on a certain day be opened to settlement; and when he referred to "a strip one hundred feet wide from the exterior of the country known as the Cherokee outlet," he evidently meant that country known as the Cherokee outlet which was then being opened to settlement and this theory is strengthened by the language used in other portions of the proclamation. The president says:

"Now, therefore, I, Grover Cleveland, president of the United States, by virtue of the power in me vested by the statutes hereinbefore mentioned, and by other laws of the United States and by the several agreements do hereby declare and make known that all the lands acquired from the Cherokee nation of Indians, the Tonkawa tribe of Indians, and the Pawnee tribe of Indians, by the three several agreements aforesaid, will, at the hour of twelve o'clock noon, (central standard time,) on Saturday the sixteenth day of the month of September, A. D., eighteen hundred and ninety-three, and not before, be opened to settlement under the terms of and subject to all the conditions, limitations, reservations, and restrictions contained in said agreements, the statutes above specified, the laws of the United States applicable thereto and the conditions prescribed by this proclamation, saving and excepting lands described and identified as follows, to-wit: The lands set apart for the Osage and Kansas Indians, (describing them) ; the lands set apart for the Confederate Otoe and Missouri tribes of Indians, (then describing the lands), and the lands set apart for the Ponca tribe of Indians, (then describing these lands.")

Then the proclamation exempts certain other reservations and lands.

From this language it will be seen that the president excepted from this opening the Osage reservation, the Kansas reservation, the Otoe and Missouri reservation and the Ponca reservation, and then finally uses the language: "Said lands

so to be opened as herein proclaimed, shall be entered upon and occupied only in the manner and under the provisions following, towit:

"A strip of land, one hundred feet in width around and immediately within the outer boundaries of the entire tract of country, to be opened to settlement under this proclamation, is hereby temporarily set apart for the following purposes and uses, etc."

This language expressly sets apart a strip within the outer boundaries of the entire tract of country to be opened to settlement under the proclamation; and although it continues with the expression: "Said strip, the inner boundary of which shall be one hundred feet from the exterior boundary of the country known as the Cherokee outlet," it must be remembered that the Indian reservations had been excepted by the president before he had reached this point in the instrument, leaving only the lands to be opened to settlement. But the president continues in the same paragraph by saying: "Such occupancy shall not be regarded as trespass or in violation of the proclamation, or of the law under which it is made; nor shall any settlement rights be gained thereby." If this strip on the east from twelve to fifty miles east of the lands to be opened to settlement why provide that such occupancy should not be regarded as tresspass, and that no settlement rights should be gained thereby? In fact why do the absurd thing of granting persons the right to start into a race for a home fifty miles away, on the east of the land to be opened when such persons could make the race from either the north south or west and start from the outer line of the land to be opened? The president must have known that no man would run from the east if he had to start from the east line of the Osage Indian reservation, and we assume that the pres-

ident did not intend to give persons the right to do that which no sane person would do. The one hundred foot strip, was a strip of land one hundred feet wide around the land actually opened to settlement. But counsel for appellant says if this be the construction to be placed upon the proclamation then persons could have gone into the country on the railroad right of way or on school land or upon allotments. We think not. In construing a law or proclamation we should always bear in mind the purpose of the law or instrument. These lands to be opened joined right up against lands owned and occupied by individuals, on every side except the east, and it was necessary to give the people a place all along the line from which they could have an equal start in the race, hence, the one hundred foot strip. If the one hundred foot strip had not been set apart, those who intended to make the race would have been compelled to start from the highways on the section lines which led into the country, and these were only four rods wide and are a mile apart, or they would have been compelled to pay license to make the race from the land adjoining the lands to be opened, for which privilege in many cases a large sum of money would have been asked, thus giving a decided advantage to the rich; and the same thing might have been true of the Indian reservations. The hundred foot strip gave all an equal show. It is alleged, though, that the defendant started from that part of the outlet known as the Ponca Reservation. From this allegation it will be seen that he was within the Ponca reservation before the hour of opening, and it is contended that the act of March 2, 1889, prohibited persons from entering upon and occupying any of the lands west of the ninety-sixth degree of longitude before the same was opened to settlement. This is true but the act of March 3, 1893, modified the act of March

2, 1889, to the extent that one who did not enter the lands opened to settlement in violation of the president's proclamation, and who was otherwise qualified could make entry. Congress and the president were dealing with the lands to be actually opened to settlement and the fact that the defendant was within the Ponca Indian reservation prior to the time of opening did not disqualify him from making homestead entry on a tract within the country opened to settlement on September 16, 1893.

For the reasons herein given the judgment of the lower court is hereby affirmed at the cost of the appellant.

Hainer, J., who presided in the court below, and Pancoast, J., who was of counsel, not sitting; Irwin, J., absent; all the other Justices concurring.